School District No. 1, in Stoneham, v. Richardson.

———

SIDNEY SPAULDING *versus* The City of LOWELL.

Cities and towns in this Commonwealth, by virtue of their general powers, have authority, in their corporate capacity, to build a market-house, to appropriate money therefor, and to assess the same upon the inhabitants.

Where a town built a market-house two stories high and appropriated the lower story for a market, which was *bonâ fide* their principal and leading object in erecting the building, it was *held* that the appropriation of the upper story to other subordinate purposes was not such an excess of authority as to render the erection of the building and the raising of money therefor illegal.

ASSUMPSIT for money had and received, to recover back the amount of a tax for the year 1836, assessed by the defendants upon the plaintiff, and paid by him.

The parties stated a case.

The town of Lowell was incorporated as a city on the 1st of April, 1836. At a town meeting on the 31st of October, 1835, it was voted, " that the interests, the health, and the accommodation of the inhabitants of the town, require that a market-house should be built ;" that the town would purchase of one Kittredge a certain lot of land for $ 14,055 ; that a committee should be authorized and empowered to procure a deed of the land from Kittredge to the town, for that price, and build thereon a market-house not exceeding 160 feet in length and 50 feet in width, nor less than 140 feet in length

and 45 feet in width, to be two stories high, and be built in a plain style, with a general reference to that of the town-house in Lowell ; that the committee might finish the building as they should judge suitable and proper ; and that they should be authorized to pledge the credit of the town for such amount of money as should be necessary to carry the foregoing votes into effect, not exceeding the amount of $ 30,000, payable at such times as they should judge necessary.

The committee afterwards purchased the land and began to build the market-house, making various contracts for labor and materials, but not accomplishing any permanent loan.

At a town meeting held on the 11th of April, 1836, by adjournment from the 7th of March, it was voted to grant $ 22,700 for incidental charges, the ensuing year, and that $ 10,000 of that sum be appropriated towards building the market-house.

In pursuance of the foregoing votes the inhabitants of the city were assessed, the sum of $ 10,000 above mentioned being included in the assessment. The plaintiff was present at the meeting in April, and voted against the tax, and with several others caused it to be stated at the time, that the tax would be resisted, if that sum should be included in the assessment. The plaintiff having refused to pay his tax when called upon by the collector, payment was enforced by a distress.

The town was previously provided with a commodious town-house. The market-house has been built at an expense of $46,000. Before it was built, the town had hired certain rooms for the use of the Lowell Police Court, at the annual expense of $ 100 ; which court, since the completion of the market-house, has been removed into the upper part of this building. About two thirds of the upper part are used by the county as court rooms, &c. but at the time of passing the fore going votes no provision had been made by law for the establishment of any term of the county courts at Lowell. The statute transferring certain terms of the courts from Concord to Lowell, was passed on the 16th of April, 1836. The separate expense of the court rooms and appurtenances, has been $ 8998. The market-house was built 150 feet in length, and 45 in width, and in other respects it conformed to the vote of

<div style="float:right">Spaulding
*v.*
Lowell.</div>

the town. On the completion of the building the stalls were let at rates prescribed by the city council, amounting to $1340 a year, and have ever since been generally occupied at the same rates. In April 1836, the population of Lowell was about 17,000. The number of ratable polls was 3993; on 2559 of whom was assessed a poll tax only.

If the Court should be of opinion that the tax was valid, the plaintiff was to be nonsuit; otherwise the defendants were to be defaulted.

<div style="float:right">*Jan. 31st,*
*at Boston.*</div>

*Robinson* and *Mellen*, for the plaintiff, referred to *St.* 1785, *c.* 75, § 7, giving towns authority to raise money " for the settlement, maintenance and support of the ministry, schools, the poor, and other necessary charges arising within the same town," and they argued that the power to raise money to build a market-house was neither incident to any of the powers expressly given, nor embraced in the general clause respecting " necessary charges ;" that the enactment of special statutes authorizing particular towns to erect a market-house favored this construction ; that in some instances a town, in erecting a building, for example, a town-hall, for a lawful corporate purpose, have furnished accommodations for a market, as a subordinate object, and this might be permitted, but here the market-house was the original and principal object, and the application of a part of it to the use of the courts was an afterthought ; that if Lowell may build a market-house, every town, however small, must have the like power ; that if a town may thus consult the comfort of the inhabitants as to fresh provisions, they may erect shops for groceries, dry goods, medicines, &c. ; 2 Kent's Comm. (1st edit.) 239, 240 ; *Head* v. *Providence Ins. Co.* 2 Cranch, 127 ; Angell & Ames on Corp. 60, 139 ; *Bank of the United States* v. *Dandridge*, 12 Wheat. 68 ; *Parsons* v. *Goshen*, 11 Pick. 399 ; *Bussey* v. *Gilmore*, 3 Greenl. 191 ; *Bangs* v. *Snow*, 1 Mass. R. 181 ; *Beaty* v. *Lessee of Knowler*, 4 Peters, 152 ; *Stetson* v. *Kempton*, 13 Mass. R. 272 ; *St.* 1816, *c.* 103 ; 1823, *c.* 147 ; that the size of the market-house erected by the defendants was extravagant and disproportionate to the population of the town ; and that by the common law the right to a market is a franchise and must be derived from an express grant, and this principle was adopted by our

Spaulding
v.
Lowell.

ancestors at an early period after their emigration from England. Jacob's Law Dict. *voc. Market* ; Com. Dig. *Market, A, C* ; 1 Bl. Comm. 274 ; Dalt. Just. *c.* 62 ; Ancient Charters, &c. 109 ; 2 Dane's Abr. 282.

*Lawrence* and *Ames*, for the defendants, cited *Stetson* v. *Kempton*, 13 Mass. R. 272 ; *Willard* v. *Newburyport*, 12 Pick. 227.

*Cct.* 16th

SHAW C. J. delivered the opinion of the Court. The question, and the only one of considerable importance, in the present case, is, whether the plaintiff was liable for the tax, which he was compelled to pay, and the amount of which he seeks to recover back in the present action. The objection is, that it embraced an assessment, to raise money for a market-house, which the town of Lowell, before its incorporation as a city, had voted to build. No question in this case arises upon the relative rights and powers of towns and cities, or upon the change from one form of municipal government to another, during the pendency of these proceedings. Lowell was established as a city in April 1836. By the terms of the charter, they were made or rather continued a corporation for all purposes, for which towns are incorporated, and they were thereby declared to be entitled to all the rights, immunities, powers and privileges, and subject to all the duties and obligations before incumbent upon and appertaining to said town. The question therefore resolves itself into the general one, whether cities and towns, in this Commonwealth, by virtue of their general powers, and without any special authority conferred on them respectively for that purpose, have authority in their corporate capacity, to build a market-house, to appropriate money therefor, and assess the same, in common with other town charges, upon the inhabitants.

The principle is now well settled, that corporations, being creatures by which several persons are associated together to act in concert, for special purposes, can exercise no powers but those which are conferred upon them by the act by which they are constituted, or such as are necessary to the exercise of their corporate powers, the performance of their corporate duties, and the accomplishment of the purposes of their association. This principle is fairly derived from the nature of

corporations, and the mode in which they are organized, and in which their affairs must be conducted. In aggregate corporations, as a general rule, the act and will of a majority is deemed in law the act and will of the whole, and therefore is to be carried into effect, as the act of the corporate body. The consequence is, that a minority must be bound, not only without, but against their consent. Such obligation may extend to every onerous duty, to pay money to an unlimited amount, to perform services, to surrender lands, and the like. It is obvious, therefore, that if this liability were to extend to unlimited and indefinite objects, the citizen, by being a member of a corporation, might be deprived of his most valuable personal rights and liberties. The security against this danger is in a steady adherence to the principle stated, that corporations can only exercise their powers over their respective members, for the accomplishment of .limited and well defined objects. And if this principle is important, as a general rule of social right and of municipal law, it is of the highest importance in these States, where corporations have been extended and multiplied, so as to embrace almost every object of human concern. The general principle itself is fully recognized in several cases in this Commonwealth. *Bangs* v. *Snow*, 1 Mass. R. 181 ; *Stetson* v. *Kempton*, 13 Mass. R. 272 ; *Willard* v. *Newburyport*, 12 Pick. 227.

But although the rule as thus stated, and thus important and salutary, is clear and unquestionable, yet much difficulty arises in the application of it, to such a class of corporations as cities and towns, on account of the indefinite and miscellaneous purposes, for which they are constituted. This difficulty is stated and illustrated in the case last above cited. *Willard* v. *Newburyport*, 12 Pick. 227

The general authority of towns to raise money by assessment of taxes on the inhabitants, was given by *St.* 1785, *c.* 75, § 7, " for the settlement, maintenance and support of the ministry, schools, the poor, and other necessary charges arising within the same town."

The authority is not much more definitely expressed in the Revised Statutes. Revised Stat. *c.* 15, § 12.

" Towns shall have power to grant and vote such sums of

*Spaulding*
*v.*
*Lowell.*

Spaulding
v.
Lowell.
money as they shall judge necessary, for the following purposes,

For the support of town schools :

For the support and maintenance of the poor :

For burial grounds ; and

For all other necessary charges arising within the same town."

By a comparison of the two provisions it will appear that one object of town charges is introduced into the Revised Statutes that was not expressed in the old one, that of burial grounds. This subject was one of those miscellaneous cases, mentioned in the case last cited, over which towns exercised an authority in fact though none was given by statute. It is since conferred by this provision of the Revised Statutes.

But the same remark may be applied to this, as to the old statute, that it is manifestly not intended as an enumeration of all the particular objects, because some of the most obvious subjects of town charge are omitted, such as highways and bridges, pounds, magazines and many others. This is also manifest from the sweeping clause " other necessary charges," which clearly implies, that many things not enumerated, are intended to be included. But the Court are not at all prepared to say, that under this term, " other necessary charges," coupled with the previous clause, " such sums as they shall judge necessary," it was intended to authorize towns to raise and appropriate money for general objects, or that it was intended to constitute a new, substantive power of taxation. It would be letting in all the mischiefs, arising from an indefinite and arbitrary power of a majority to bind a minority, to an unlimited extent. *Beaty* v. *Lessee of Knowler*, 4 Peters, 152. On the contrary, we think it referred to other provisions of law, and well established usage, to ascertain what the objects of town charge are, and to provide that towns might raise money for any purposes thus determined. But to bring any particular subject within this description of necessary town charges, it must appear to be money necessary to the execution of some corporate power, the enjoyment of some corporate right, or the performance of some corporate duty, as established by law or by long usage. For instance, towns are authorized and required to hold meetings ; as incidental thereunto they may hire,

purchase or build a town-house. They may prosecute and defend suits ; as incident to which, they may appropriate money to retain counsel, to pay costs, and to meet and satisfy judgments, which may be recovered against them. In this very case, should the plaintiff recover, the defendants must have authority in their corporate capacity, to raise money to satisfy the judgment, of which the plaintiff, if he continues an inhabitant, will be liable by way of assessment to pay his part.

The earlier statutes of the province and colony, concur with those under the present constitution, in vesting towns with the power to agree upon and make rules, orders and by-laws for managing and ordering the prudential affairs of the town. *St.* 1785, *c.* 75, § 7 ; Revised Stat. *c.* 15, § 13. The ambiguity lies in the indefinite term *"prudential affairs,"* and the difficulty arises in each case, in settling what concerns fall within it. One thing is very clear, that it cannot include those objects of social concern, which are expressly vested in other bodies, as was settled in the case of *Stetson* v. *Kempton.* In that case it was held, that the defence of the country against a foreign enemy, being placed under the jurisdiction of the general and state governments, could not be deemed an object, for which towns can raise and appropriate money.

In the case of *Willard* v. *Newburyport,* above cited, some attempt was made to describe what is understood to be " prudential concerns," by stating that it embraces those subjects affecting the accommodation and convenience of the inhabitants, not otherwise specifically provided for, which have been placed under the jurisdiction of towns by statute or by usage. It may be suggested that referring to usage as a source of this power, is still leaving subjects open to doubt. It does so ; but as there are some subjects which have long been regarded as within the authority of towns, not made so by statute, and as such powers have never been questioned, there is no authority ; whence they can be derived but usage. Indeed a recurrence to the history of the formation of towns, will show that most of the powers originated in usage, founded on the convenience and necessities of the inhabitants, and were afterwards recognized and confirmed by statute. Townships were originally local divisions of the territory, made with a

7 *

view to a settlement and disposition of the property in the soil. But the inhabitants of each, acted together, on many subjects of common interest to themselves, and those especially, in the first instance, which affected the partition and appropriation of the land, amongst the proprietors, who were strictly tenants in common. But from convenience and necessity, they adopted many other regulations, affecting their mutual interests as settlers and inhabitants. After these regulations had continued for some years, they were recognized and confirmed by statute. The first act which seems to have been passed, was in 1670, forty years after the first settlement. And the provincial act of 1692, contains a preamble reciting, that whereas it has been a *continuea practice and custom* in the several towns within this province, annually to choose selectmen or townsmen, for the ordering and managing of the prudential affairs, &c. and then goes on to provide for the choice of selectmen, overseers, constables, surveyors of highways, tithingmen, fence-viewers, clerks of the market, sealers of leather, and *other ordinary* town officers. The same statute gives to towns the authority to make orders and by-laws, "for managing and ordering their prudential affairs of such town, as they shall judge most conducing to the peace, welfare and good order thereof." From this and various other legal provisions, we think it will be found that towns were not originally incorporated with specific and enumerated powers ; but that the inhabitants and settlers of each township, as organized bodies, adopted regulations for their common convenience, and when they were incorporated, or rather recognized by general laws, as established corporations, the powers which they had thus been used and accustomed to exercise, were referred to, and confirmed, under the very broad and comprehensive term, "prudential concerns." So in the officers to be elected, after enumerating many specifically, the statute of 1692, adds, "other ordinary town officers." Care seems to be taken lest in a specific enumeration, some might be omitted, who, according to custom, ought to be chosen. And the same solicitude is manifested through all the succeeding enactments, down to the Revised Statutes, which, after enumerating many officers to be elected, closes with the addition of "all other usual town officers."

In looking to usage and custom as the means of ascertaining what subject of common interest is embraced under the term "prudentials," the Court are of opinion, that the erecting of a market-place, in the large towns and populous villages, is embraced. The circumstance, that special acts of legislation have been occasionally passed respecting the building of market houses, can have no considerable influence. Even if they embraced a power, in terms, to erect a market-house, it might be accounted for, by considering it as done *ex majori cautelâ* ; but in general it will be found, that these acts embraced other and additional powers, which could not be used under the general authority to erect a market-house, such as the taking of land for the public use, as in the case of the extension of Faneuil Hall Market or the like. *St.* 1823, *c.* 147. In the case of *Stetson* v. *Kempton*, which seems to have been well considered, and has ever since been regarded as a leading case, in considering what limitation is to be put on the power to raise money, for " other necessary charges," it is said, " the erection of public buildings for the accommodation of the inhabitants, such as town-houses to assemble in, and market-houses for the sale of provisions, may also be a proper town charge, and may come within the fair meaning of the term " *necessary*." And though it was not the question directly before the Court, yet being put by way of instance as itself unquestionable, to illustrate the general proposition, and to distinguish what were and what were not objects of town charge, it is very strong evidence of the usage. The early statutes on the subject of holding markets, and establishing market days, can have but little bearing on the present question. They related to holding open markets, at particular times and places, which was regarded as a franchise at common law. We think the present question stands upon another and different footing, that of long established and well settled usage. And in considering this subject of usage, it is proper to add, that it is not a casual or occasional exercise of a power, by one or a few towns, which will constitute such a usage ; but it must be a usage, reasonable in itself, general amongst all towns of like situation, as to settlement and population, and of long continuance.

On the whole, the Court are of opinion, that the town and city of Lowell had authority to raise and appropriate money for building a market-house, and to assess the same upon the inhabitants.

It was further contended, in the present case, that even if the town had authority to assess money for building a market-house, yet that it would not justify the present tax, because a part of the building was appropriated to other objects. If this had been a colorable act, under the pretence of exercising a legal power, looking to other and distinct objects beyond the scope of the principal one, it might be treated as the abuse of power, and a nullity. But we perceive no evidence to justify such a conclusion, in the present case. The building of a market-house was the principal and leading object, and every thing else seems to have been incidental and subordinate. We cannot therefore say that it was such an excess of authority as to invalidate the acts, which they might rightfully do. As to the size and other circumstances of the building, if the accomplishment of the object was within the scope of the corporate powers of the town, the corporation itself was the proper judge of the fitness of the building for its objects, and it is not competent in this suit to inquire whether it was a larger and more expensive building, than the exigencies of the city required.

*Plaintiff nonsuit.*